UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BERN UNLIMITED, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>EASTON-BELL SPORTS, INC., THE BURTON CORPORATION, SMITH SPORT OPTICS, INC., d/b/a SMITH OPTICS, INC., AMER SPORTS WINTER & OUTDOOR CO., and VANS, INC.,<br><br>            Defendants. | Civil Action No. 11-12278-FDS |

**PLAINTIFF BERN UNLIMITED, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE AND EXCLUDE EXPERT OPINIONS OF ITAMAR SIMONSON**

Plaintiff Bern Unlimited, Inc. ("Bern") submits this memorandum in support of its motion to strike the expert reports of Itamar Simonson and otherwise exclude any of his purported expert opinions or testimony.  Defendants have submitted two expert reports from Mr. Simonson, one relating to secondary meaning, and one relating to likelihood of confusion.  Because Mr. Simonson has not satisfied the requirements of FRE 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) and its progeny, with respect to either of his expert reports, his opinions should not be admitted in evidence, and the Court should not consider them in connection with Defendants' pending summary judgment motions.

**FACTUAL BACKGROUND**

In support of their Combined Motion for Summary Judgment, Defendants have submitted Simonson's expert report (Dkt. No. 259-1) regarding a consumer survey commissioned by Defendants that, according to Defendants, "irrefutably establishes that consumers do not associate the Baker design with Bern."  Brief in Support of Defendants' Combined Motion for

Summary Judgment (Dkt. No. 256) ("Defts' Combined Br.") at 1.  Defendants go so far as to state that Simonson's secondary meaning survey is the "only direct evidence in this case" of secondary meaning.  *Id.*  Simonson's secondary meaning survey is irrelevant because it purports to measure secondary meaning in April 2014, when the relevant time is 2008–2009.

Defendants Burton, BRG, Smith, K2, and ASWO have also submitted Simonson's rebuttal expert report regarding a consumer survey Defendants commissioned to examine likelihood of confusion.  *See* Declaration of Dr. Itamar Simonson in Support of Defendants' Motions for Summary Judgment Regarding Likelihood of Confusion (Dkt. No. 271) ("Simonson LOC Survey").  The Simonson LOC Survey is deeply flawed for the reasons described below.

For these reasons, described more fully below, Bern has moved to strike both Simonson expert reports and all of his opinions.

## **LEGAL STANDARD**

The admission of expert evidence is governed by FRE 702, which assigns to the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert,* 509 U.S. at 597.  To determine whether an expert's testimony is sufficiently reliable, the district court must consider whether "the testimony is based on sufficient facts or data"; whether "the testimony is the product of reliable principles and methods"; and whether "the expert has reliably applied the principles and methods to the facts of the case."  FRE 702; *see also Daubert,* 509 U.S. at 592-94.  With respect to the relevance of the expert's opinions, the court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue."  *Daubert,* 509 U.S. at 592.

**ARGUMENT**

I.      **Simonson's Secondary Meaning Survey is Irrelevant and Should Be Excluded.**

Simonson's secondary meaning survey is irrelevant because it was not taken at the correct time. To be relevant, a secondary meaning survey must have been conducted at the time of first infringement, which in this case was in 2008–2009 when the accused helmets began being introduced. *See Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.,* 214 F.3d 432, 440 (3d Cir. 1999) (holding that a customer satisfaction survey taken in the late 1990's was irrelevant to whether the mark established secondary meaning as of 1983). Simonson conducted his secondary meaning survey of prospective helmet purchasers in April 2014 (Dkt. No. 259-1), ¶¶ 11–12, and accordingly did not measure the secondary meaning of the Bern Trade Dress as of 2008–2009 at the time of first infringement. Defendants have even conceded this point: "rather, distinctiveness must be proven to exist *before* Defendants began selling their accused products, a point which Bern concedes." Defts' Combined Br. at 9–10, *citing Bay State Sav. Bank v. Baystate Fin. Servs., LLC,* 484 F. Supp. 2d 205, 214 (2007) ("Plaintiff is required to show that its marks had acquired secondary meaning before defendant began using the same or similar mark").

Accordingly, the secondary meaning survey of prospective helmet purchasers conducted by Simonson in April 2014 is irrelevant. It was conducted six years too late, by which time the Bern Trade Dress has been widely and confusingly copied by Defendants for many years. Simonson's secondary meaning survey is therefore not reliable, and does not meet the standards of FRE 702 or *Daubert*. The Court should exclude it, and not consider it in connection with Defendants' Combined Motion for Summary Judgment on secondary meaning.

## II.     The Simonson LOC Survey Is Flawed and Unreliable.

The Simonson LOC Survey is flawed and unreliable for numerous reasons.  He used a survey methodology that is inappropriate, and did not even properly follow the methodology that he chose to use.  In addition, the universe of survey respondents used by Simonson was incorrect, and he conducted the survey using unrealistic testing conditions.  He also used a sample size that was too small, and employed improper data collection procedures.  For all of these reasons, as more fully described below, the Simonson LOC Survey is unreliable and should be disregarded.

### A.     *Improper choice of an interview methodology.*

Simonson used a variant of the so-called "Eveready" methodology.  The Eveready methodology typically presents a respondent with the junior user's mark or trade dress and asks questions designed to measure the consumer's perception (or misperception) of the source of the mark.  Implicit in this methodology is the assumption that the senior user's mark is easily retrieved from memory.  Jerre Swann, "Likelihood of Confusion Studies and the Straitened Scope of Squirt," 98 Trademark Reporter 739, 745 (2008).  *See* Declaration of Robert Klein in Opposition to Defendants' Motions for Summary Judgment ("Klein Decl."), ¶ 4.[1]  As shown in the Likelihood of Confusion Survey Methodology and Results dated April 28, 2014 submitted by Robert Klein (the "Klein Report") (Klein Decl., Exh. 1), the Bern Trade Dress has now been widely and confusingly copied by the Defendants.  For this reason an Eveready survey format is inappropriate at this time (in 2014) because the Bern Trade Dress has been copied by many of the helmets displayed to respondents in the pre-stimulation array employed by Simonson, as described below.  *Id.*

---

[1] The Klein Decl. is being filed simultaneously herewith.

B.  *Improper Pre-Stimulation Array.*

The Simonson LOC Survey did not even properly follow the so-called "Eveready" methodology, contrary to Simonson's statement in his report. Simonson LOC Survey, ¶ 25 & n.16. In the Simonson LOC Survey, the interviewees were shown an array of other brands before being shown the Defendants' helmets. Simonson LOC Survey, ¶ 60. The Eveready format does not include this "pre-stimulation" of the interviewees. Plaintiff's expert Klein is not aware of any other marketing survey that has been conducted in this manner or has been accepted by a court as reliable. Klein Decl., ¶ 5.

In addition, the color of the Bern model chosen by Simonson made it particularly hard for the interviewees to see the Bern logo. *See* Simonson LOC Survey, Exh. G. Simonson chose a Bern Baker helmet that had the Bern logo in white on a white background. *Id.* The model used by Simonson is not a model that went into mass production, but instead may have been a sales sample, and one with a particularly hard-to-read logo. *See* Supp. Godwin Decl. ¶¶ 15–17. Simonson chose this color scheme despite the existence of others in which the Bern logo is more plainly visible, e.g., a black logo on a white background, as depicted below:



5

In contrast, for the Defendants' helmets Simonson chose color schemes in which the Defendants' logos were plainly visible, e.g., for Giro, Simonson chose a helmet which had black lettering with a white background.  *See* Simonson LOC Survey, Exh. G.  Combined with the near-invisibility of the Bern logo, these color choices had the effect of raising the interviewees' awareness of the Defendants' brands immediately before questioning, but not raising the awareness of Bern's brand.  Klein Decl., ¶¶ 6–7.

The interviewers positioned this pre-stimulation array of helmets facing brim-forward, which makes observation of the brim and the distinctive profile of the Bern Trade Dress impossible without physically manipulating the helmets.  *See* Simonson LOC Survey, Exh. G.  The pre-stimulation array contained a majority of helmets with confusingly-similar (accused) visors, which may have suggested that the Bern Baker visor was less distinctive than it would appear against the full spectrum of visorless helmets.  Also, by not including bicycle helmets such as the controls used in the Klein Report, the pre-stimulation array contained an implicit suggestion that the helmet marketplace was primarily similar to the Bern Baker helmet.  Klein Decl., ¶¶ 8–9.

Accordingly, the pre-stimulation array, which is not part of the Eveready test, renders the Simonson LOC Survey unreliable.

      C.     *Improper Choice of Pseudo-Eveready Test.*

The Eveready test would not have been the correct choice of test, even if Simonson had adhered to the appropriate Eveready methodology.  The Eveready test is appropriately used where product is sold in **different** stores and the two marks are unlikely to be encountered in close proximity in the marketplace.  Klein Decl., ¶ 11.  Simonson himself has testified to this effect.  *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235–36 (S.D.N.Y. 2010) ("Dr.

6

Simonson further testified that an *Eveready* study is the appropriate design — and a sequential survey is inappropriate — where the products are in the same category of goods but are sold in *different* stores *within* the same shopping center." (emphasis in original)).

Here, however, helmets are sold side-by-side in retail or specialty shops, or can be viewed sequentially over the internet. In this situation, the sequential survey used in the Klein Report is appropriate. Simonson agrees. *See id.* at 235 ("According to Dr. Simonson, 'a sequential presentation of the two marks at issue (or array) is appropriate only if it reflects a significant number of real world situations in which both marks at issue are likely to be evaluated sequentially or side-by-side.' ")

      D.      *Incorrect Universe of Respondents.*

As noted above, the helmets used as stimuli in the Simonson LOC Survey were all snow helmets. But Simonson permitted participants to participate in the survey if they intended to purchase bicycle, skate, water, **or** snow helmets. Simonson LOC Survey, ¶ 64.

The snow helmet market is significantly smaller than the bicycle helmet market. In the U.S., according to the Bicycle Helmet Safety Institute, an estimated 12 million to 15 million bicycle helmets are sold annually. *See* http://www.helmets.org/market.htm. The annual sale of snow helmets, however, is approximately 1.2 million, or one-tenth the amount. Supp. Godwin Decl. ¶ 2. Accordingly, a substantial portion, if not the vast majority, of survey participants were not likely to be in the market to purchase any of the helmets used as stimuli in the Simonson LOC Survey and should not have qualified to participate in the survey. The likelihood that such respondents would exhibit source confusion between Defendants' and Bern's snow helmets would therefore be irrelevant. Klein Decl., ¶ 14.

7

In addition, the Simonson LOC Survey failed to disguise the nature of the survey during intake questions, which could lead to respondents guessing the answers to questions in order to qualify for the survey and claim the participation fee. Here, the survey only asked whether the participants worked for a helmet manufacturer or marketing company, without disguising those possibilities in a list of other types of companies. By asking the question in this yes/no format, the survey alerted participants to the fact that the survey was about helmets before they were asked the key screening question, which was whether they intended to purchase a helmet in the next 12 months. The problem of alerting the interviewee to the nature of the survey is particularly relevant in mall surveys where mall employees are not excluded (such as the Simonson LOC Survey), as those employees may view survey participation as a way to earn "lunch money." The Simonson report does not disclose how many interviewees did not satisfy the criterion of whether they intended to purchase a helmet in the next 12 months, instead only reporting the data of the 770 interviewees who responded affirmatively. Simonson LOC Survey, ¶ 63. By not providing additional answer options to the question asking about occupation, respondents were alerted about the subject of the interviews. Therefore the Simonson Survey did not adequately protect against individuals who are not potential helmet purchasers from answering dishonestly in order to qualify for the survey. Klein Decl., ¶ 15.

Indeed, the open-ended responses to questions revealed that many of the respondents were not qualified to participate in the survey. For example, responses to questions about which company makes the helmet included the following: "I'm not familiar with helmet brands," "I don't usually wear a helmet. Not familiar," "I remember reading it. Can't say anything more — don't know much about helmets." Simonson LOC Survey, Exh. I. In addition, fewer than half of the respondents were able to identify the brand name of a helmet even when they were shown

a helmet with the name clearly visible upon it.  Simonson LOC Survey, Exh. H, Table 5.  Klein Decl., ¶ 16.

      E.     *Unrealistic Testing Conditions.*

Although Simonson states that interviewees were instructed that they could pick up individual helmets "if that is what you would normally do before deciding which helmet to buy," the Simonson LOC Survey did not record whether interviewees actually did so.  Simonson LOC Survey, ¶ 68 & Exh. H (showing which questions were recorded).  Strangely, interviewees were then not permitted to examine helmets further during testing, Simonson LOC Survey, ¶ 69, although the alleged purpose of the in-person interviewing was to mimic actual purchase conditions in which customers could examine multiple helmets.  Klein Decl., ¶ 17.

The helmets were also positioned such that any "hang tags" that might identify the helmets were not visible.  Simonson LOC Survey, Exh. G.  Again, although the interviewees might have picked up an individual helmet before questioning, the Simonson LOC Survey did not record whether they did so, and the interviewees were not permitted to do so during questioning.  Klein Decl., ¶ 18.

      F.     *Improper Question Wording*.

The Simonson LOC Survey asked (Q3a) "If you have an opinion, what other products or brands, if any, are made by the same company that makes this product?"  By asking about "other products or brands," the question ruled out by implication the products and brands the interviewee was just invited to inspect, which included the Bern Baker helmet.

The "other products" wording was misinterpreted by many interviewees as referring to other non-helmet products, as most of the responses concerned other bike, snow, or skate-related products such as pads, skateboards, headphones, or gloves.  In order to properly measure

perceptions of associations among helmet brands, the survey should have asked whether "other helmet brands" were made by the same company that makes the helmet that respondents were shown. Klein Decl., ¶¶ 19–20.

G. *Small Sample Size.*

The Simonson LOC survey had relatively small test cells, with only approximately 70 consumers seeing each test helmet. As noted above, fewer than 1 in 10 were likely snow helmet purchasers meaning that the effective sample size for the questions actually asked was fewer than 10 or perhaps even 5. No reasonable conclusions can be based on such a small sample size. In contrast, the Klein Survey tested at least 100 consumers for each test helmet. Klein Decl., ¶ 21.

H. *Improper Data Collection Procedures.*

In addition to failing to record whether respondents actually examined the helmets in the array, survey interviewers were given the unusual instruction to "record ONLY the answers to the question . . . . Do not record 'thoughts or comments' that may be said aloud by the respondent." This instruction may have excluded potentially important statements by the respondents and is contrary to the intent and purpose of an in-person interview. Klein Decl., ¶ 22.

For all of these reasons, the Simonson LOC Survey is unreliable, not based on sufficient facts or data, and not the product of reliable principles or methods.

**CONCLUSION**

For the foregoing reasons, Bern respectfully requests that its Motion to Strike and Exclude the Expert Opinions of Itamar Simonson be granted.

Dated: September 5, 2014

Respectfully submitted,

BERN UNLIMITED, INC.,

By its attorneys,

/s/ David S. Godkin
David S. Godkin (BBO#196530)
Andrew A. Caffrey, III (BBO#660481)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100
godkin@birnbaumgodkin.com
caffrey@birnbaumgodkin.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was delivered to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent those indicated as non-registered participants on the above date.

/s/ David S. Godkin
David S. Godkin