# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**BERN UNLIMITED, INC.,**               )
                                        )
    **Plaintiff,**  )
                                        )      **Civil No.**
    **v.**            )      **11-12278-FDS**
                                        )
**THE BURTON CORPORATION;**             )
**BRG SPORTS, INC.; SMITH SPORT**       )
**OPTICS, INC., d/b/a SMITH OPTICS,**   )
**INC.; VANS, INC.; AMER SPORTS**       )
**WINTER & OUTDOOR CO.; and**           )
**K-2 CORPORATION,**                    )
                                        )
    **Defendants.** )
_____)


## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

    This is a dispute alleging trade-dress infringement and unfair competition brought by a company that sells sports helmets. Plaintiff Bern Unlimited, Inc., has brought suit against six other makers of sports helmets. Bern contends that its helmets have a unique design, featuring a small visor and rounded shape. It further contends that the distinctive look of its helmets constitutes a protectable trade dress, and that defendants are manufacturing and selling confusingly similar helmets, thereby misleading the public. It seeks relief under both federal and state law.

    Defendants Burton Corporation; BRG Sports, Inc. (formally known as Easton-Bell Sports, Inc.); Smith Sport Optics, Inc.; Vans, Inc.; Amer Sports Winter & Outdoor Co.; and K-2 Corporation have brought counterclaims against Bern, contending that Bern's marketing of its

helmets constitutes false advertising in violation of federal and state law.  In particular, they contend that Bern falsely advertised the helmet as "patented," when it knew that the patent was invalid.  Defendants seek relief under both federal and state law.

Defendants have moved for summary judgment on the trade-dress and unfair competition claims.  Plaintiff has also moved for summary judgment as to the counterclaims for false advertising.  Both parties have also filed various motions to strike and exclude evidence.  For the following reasons, summary judgment will be granted as to both sets of claims.

I.     **Background**

A.     **Bern Unlimited, Inc.**

Bern Unlimited, Inc., is a manufacturer of helmets for biking, skating, snow, and water sports, based in Duxbury, Massachusetts.  (Third Am. Compl. ¶ 11, Docket No. 158; Leedom Decl. ¶ 1, Docket No. 67-1).  In January 2006, Bern began selling its Baker line of snow helmets.  (Third Am. Compl. ¶ 11).[1]

Bern contends that its helmets feature two distinctly identifiable elements:  first, the "rounded profile of the helmet, which is designed to follow the shape of the wearer's head"; and second, "the distinctive visor."  (*Id.*).

After the Baker helmet, Bern introduced other lines of helmets incorporating its trade dress.  (Third Am. Compl. ¶ 13; Hanewicz Decl. Ex. 1-8).  Those lines included the Watts, Lenox and Muse line of helmets for adults, and the Bandito and Bandita youth helmets.  (Third Am. Compl. ¶ 13; Hanewicz Decl. Ex. 1, Docket No. 258-1).

---

[1] Bern offered the Baker helmets for sale on a consignment basis in December 2005.  (Dkt. No. 234 ¶ 13).

### B. **Defendants**

#### 1. **Burton**

The Burton Corporation is based in Burlington, Vermont. (Third Am. Compl. ¶ 3). In January 2007, Burton introduced its Mutiny helmet as part of its Red brand at the SIA Snow Show. (Cook Decl. ¶ 3, Docket No. 261). In 2008, Burton released a youth model of the Mutiny under the name Defy. (*Id.* ¶ 4). It released a women's model named Asylum in 2012. (*Id.* ¶ 4). In October 2012, the Mutiny, Asylum, and Defy helmets were replaced by the Blitz, Aera, and Scout, respectively. (*Id.* ¶ 5).

#### 2. **BRG Sports**

BRG Sports, Inc., formerly Easton-Bell Sports, Inc., is based in Scotts Valley, California. (Third Am. Compl. ¶ 2; Notice Change Party Name, Docket No. 193). In approximately August 2010, BRG began accepting orders for its Giro Surface helmet. (Carreyn Decl. Ex. 1, Docket No. 272-1). It first shipped the Giro Surface in September 2010. (*Id.*). BRG started accepting orders for the Giro Surface S, the snow version of the helmet, in approximately November 2010. (*Id.*). That helmet first shipped in approximately June 2011. (*Id.*). The following year, BRG introduced the Vault, the youth version of the helmet. (Shapleigh Dep. 157, 162, Docket No. 324).

#### 3. **Smith Sports Optics**

Smith Sport Optics, Inc. is based in Ketchum, Idaho. (Third Am. Compl. ¶ 4). In January 2012, Smith introduced its Gage helmet at the SIA Snow Show. (Chilson Decl. ¶ 11, Docket Nos. 262, 290). Smith previously introduced its Variant and Hustle helmets with short

brims and rounded profiles in January 2007 and January 2008, respectively.  (*Id.* ¶¶ 7, 8).[2]

### 4.    Amer Sports

Amer Sports Winter & Outdoor Company is based in Ogden, Utah.  (Third Am. Compl. ¶ 5).  Amer Sports began selling a helmet with a brim or visor in 2003 with the Crossmax model.  (Key Decl. ¶ 4, Docket No. 277).  In 2007, Amer Sports started marketing the Salomon Patrol and Salomon Poison helmets.  (*Id.* ¶ 5;  Key Decl. Ex. 4, Docket No. 277-4).  Other models followed.  (Key Decl. Ex. 4).  Each of the Salomon helmets has a rounded profile and a visor.  (Third Am. Compl. ¶¶ 18, 21).

### 5.    K2

K2 Corporation is based in Seattle, Washington.  (Third Am. Compl. ¶ 8).  In December 2006, K2 introduced its Rant helmet.  (Steere Decl. ¶ 14, Docket No. 260).  It began selling the Rant helmet to dealers in January 2007.  (*Id.*).

### 6.    Vans

Vans, Inc. is based in Cypress, California.  (Third Am. Compl. ¶ 6).  Vans sells helmets known as the Pro-Tec Riot and the Pro-Tec Scandal.  (*Id.* ¶¶ 19, 21).  It began selling those helmets in January 2011 and August 2012, respectively.  (Caffrey Decl. Ex. 73, Docket No. 360).

---

[2] Bern contends that these helmets do not have rounded profiles or the distinctive brim of the Bern Trade Dress.  However, the Court notes that these helmets clearly have rounded profiles.  (Chilson Decl. ¶¶ 7-8).  Bern cites Smith's 30(b)(6) deposition as evidence that Smith admitted these helmets do not have rounded profiles or the distinctive brim of the Bern Trade Dress.  However, the deponent merely denies that those helmets have the same profile as the Bern Baker.  (Smith 30(b)(6) Dep. by Chilson at 77-78, Docket No. 334-8).

## C.      The Bern Trade Dress

### 1.      Marketing of the Bern Helmet

According to Bern, it launched a new line of helmets with the goal of creating a trade dress that would allow consumers to identify those helmets as Bern helmets, whether they had the Bern logo or not.  (Bern 30(b)(6) Dep. by Godwin at 44-47, 54, Docket Nos. 254-2, 334-8). The Bern Baker was the first of a line of helmets that had a rounded profile and a distinctive visor.  That helmet received great interest when it was first shown at trade shows.  (*Id.* at 480-82).  In January 2006, Seth Wescott of the United States won a gold medal in snowboarding at the Winter Olympics wearing a Bern Baker helmet.  (*Id.* at 425).  The day after Wescott's performance, the number of visitors to Bern's website was approximately 9,800, as compared to an average of 120 per day before.  (*Id.* at 466-67).

From 2006 to 2010, "Bern experienced compounded annual growth of approximately 45 [percent] in total revenues from all products, and approximately 46 [percent] compounded annual growth in revenues from brim-style helmets."  (Pl.'s SMF Opp. Vans' Mot. Summ. J. ¶ 39, Docket No. 254-1 (citing Floyd Decl. ¶ 2, Docket No. 254-9)).  Over that five-year period, Bern's sales-unit volume grew at a rate of 39 percent annually for all products and 38 percent annually for brim-style helmets.  (*Id.* ¶ 40 (citing Floyd Decl. ¶ 2)).  Between its launch and March 2014, Bern has sold 726,826 brim-style helmets in 47 countries worldwide.  (Floyd Decl. Ex. A, Docket No. 254-9; Godwin Decl. ¶ 5, Docket No. 254-10).  Those sales have produced total revenues of $22 million.  (Floyd Decl. Ex. A).

Bern has spent more than $1 million advertising, marketing, and promoting its helmets. (Godwin Decl. ¶ 2, Ex. 1, Docket No. 254-10).  Bern has submitted what it refers to as "a

representative sample of . . . advertisements featuring the Bern Baker and other brimmed Bern helmets." (*Id.* ¶ 3, Ex. 2, Docket Nos. 254-10, 254-11). Bern has sponsored at least 50 professional athletes who have worn its helmets at "highly-publicized professional athletic events." (Pl.'s SMF Opp. Vans' Mot. Summ. J. ¶ 43 (citing Godwin Decl. ¶ 4, Ex. 3, Docket No. 254-11)). Bern contends that those athletes chose to wear its helmets because of their distinctive style. (Cook Decl. ¶ 2, Docket No. 67-6; Sporastoyl Decl. ¶ 2, Docket No. 67-7). Articles published in the *Boston Globe*, *Entrepreneur*, *Backpacker*, *Stuff*, *Vogue*, *Wired*, *Mens Fitness*, *Powder*, *Skiing*, *Transworld Snowboarding*, *Gala Style*, *Fri Flyt*, *TransWorld Business*, *SickLines.com*, and *BikeBiz* have profiled Bern's helmets. (Godwin Decl. ¶ 6, Ex. 4). In addition, celebrities have been pictured wearing Bern helmets, other companies have included the helmets in their own promotional materials, and the helmets were featured in the movie *Premium Rush*. (Godwin Decl. ¶¶ 7-9; Godwin Decl. Ex. 5, Docket No. 254-12; Godwin Decl. Ex. 6, Docket No. 254-12).

### 2. Customer Declarations

Bern submitted declarations from Christopher Mitchell, David Sadr, Christian Denis, Robert Shaw, and Ryan Montani in opposition to defendants' motions for summary judgment.[3] Mitchell, Sadr, Denis, Shaw, and Montani are all Bern customers; three are retailers and two are consumers. Bern submitted the declarations in support of its contention that customers have come to associate the distinctive appearance of the brimmed helmets with Bern.

---

[3] Those five declarations are the subject of defendants' motion to strike on the ground that Bern did not identify the witnesses at any point during the discovery process. (Def Vans' Mot. Strike Bern's Untimely Decl., Docket No. 295).

Mitchell is a buyer at Brave New World Surf and Snow, a retailer of surf and snow equipment in Point Pleasant, New Jersey. (Mitchell Decl. ¶ 1, Docket No. 244). In his declaration, he stated that he first heard about Bern helmets in or around 2006, and that he remembers "that the helmet immediately struck [him] as having a new and different appearance. The combination of the brim with the low profile of the helmet was unique in the marketplace." (*Id.* ¶ 2). He also stated that he "associated the distinctive appearance of the Bern brim-style helmets with Bern . . . ." (*Id.* ¶ 3).

Sadr was a buyer for backcountry.com, an online retailer of outdoor recreational equipment. (Sadr Decl. ¶ 2, Docket No. 246). He stated that he first heard about Bern helmets in 2006. According to Sadr, the "Baker immediately stood out as having a completely different look and style from the other helmets on the market. . . . Because the look of the Baker was so new and different, [he] associated the low profile, brimmed look of the Baker with Bern . . . ." (*Id.* ¶¶ 2-4).

Denis owns Elite Feet, a ski and bicycle equipment store with two locations in the Lake Tahoe area. (Denis Decl. ¶ 2, Docket No. 251). He stated that he first heard about Bern helmets in the winter of 2005-06. (*Id.*). According to Denis, "Bern's Baker helmet was unique when it was launched because of the low profile of the helmet combined with the short brim. . . . Because this design was unique, [he] associated the profile of the Bern Baker helmet with Bern . . . ." (*Id.* ¶¶ 3-4).

Shaw stated that he is a consumer who has owned Baker, Watts, and Macon helmets manufactured by Bern. (Shaw Decl. ¶ 1, Docket No. 248). According to Shaw, he first saw Bern's Baker helmet the ski season when it was launched. (*Id.* ¶ 2). He stated that he "had

never seen any helmet like the Baker before. . . .  Because of the unique design of the Bern Baker helmet . . . , [he] associated the shape of the Baker helmet with Bern . . . ." (*Id.* ¶ 3, 5).

Montani stated that he is a consumer who owns Baker and Macon helmets manufactured by Bern.  (Montani Decl. ¶ 1, Docket No. 250).  According to Montani, "[w]hen the Bern Baker helmet was launched, its short visor look was unlike any helmet [he] had ever seen." (*Id.* ¶ 2).  He stated that he "associated the short brim look of the Baker with Bern . . . ." (*Id.* ¶ 3).

Bern has not conducted a survey of consumers, nor has it offered expert testimony on the subject of secondary meaning.

### 3.  Alleged Copying of Bern Trade Dress

As evidence that its trade dress is distinct, Bern contends that each of the defendants looked to Bern's helmets when designing their own helmets.

#### a.  Burton

Internal documents from Burton's development of the Red Mutiny helmet make multiple references to Bern.  One is a document entitled "Burton's Product Development Program Charter."  (Suppl. Caffrey Decl. Ex. 29, Docket Nos. 334-2, 334-3).  The Product Development Program Charter was a project brief that "outlines information about a particular product that Burton is looking to develop."  (Burton 30(b)(6) Dep. by Cook 37-38, Docket No. 334-8; *see* Suppl. Caffrey Decl. Ex. 29).  In that document, Burton conducted a competitive analysis, where it looked at "[t]he current competitive landscape . . . made up of . . . Giro, Bern, Protec and Boeri."  (Suppl. Caffrey Decl. Ex. 29).  Burton's stated goal for developing "a new helmet model" was to create a "design signature for the brand" that "will appeal primarily to Riders."  (*Id.*).  The project brief included a picture of the Bern Baker helmet and an analysis of

its branding and specifications. (*Id.*). The analysis of the specifications did not specifically mention the rounded profile or the distinctive visor. (*Id.*). In addition, the project brief called Bern a "competitive threat." (*Id.*; Burton 30(b)(6) Dep. by Cook 46-47). One of the explanations for the strategic rationale behind designing a new helmet was "to keep this competitive threat at bay." (Suppl. Caffrey Decl. Ex. 29). The project brief included an analysis of strengths, weaknesses, opportunities, and threats for the new helmet. (*Id.*). One of the identified threats was that "Bern grows more than anticipated and this helmet is seen as an also ran." (*Id.*; Burton 30(b)(6) Dep. by Cook 57-58).

In Burton's phase I review during the development of the Mutiny helmet, it described two of its strategic rationales as follows: "We cannot afford to let Bern move forward" and "[Vans] Protec is also a threat." (Suppl. Caffrey Decl. Ex. 30, Docket No. 334-4). During the design process, Burton's designers used a variety of images to guide them. (*Id.* Ex. 31, Docket No. 334-5). Many helmets were included in those images, including a picture of the Bern Baker helmet. (*Id.*).

### b. **BRG**

Internal documents from BRG's development of the Giro Surface contain multiple references to Bern. In an April 16, 2008 e-mail, BRG's senior Giro brand manager noted that he has "noticed plenty of messenger types wearing sleek little brimmed helmets in the last year or so." (Suppl. Caffrey Decl. Ex. 33, Docket No. 334-6). In response, Warren Gravely, BRG's senior product manager for specialty helmets, wrote, "You mean helmets like the Bern? We are doing a bike version of the Shiv, but we have no plans for a brimmed model. I think Phil is looking into a brimmed helmet, so maybe we can consider that for bike in the future?" (*Id.*). In

an October 23, 2008 e-mail, Gravely wrote of the intention "to design a skate-style hard-shell helmet that includes a fit system . . . and a Bern style brim." (*Id.* Ex. 34, Docket No. 334-6). BRG employees also created a product brief that summarized the development program for the Giro Surface. (*Id.* Ex. 35, Docket No. 334-6; Shapleigh Dep. 87, Docket No. 334-8). In the section entitled "styling direction," the brief stated that the "design of this helmet should be a basic hard-shell, skated-styled shape, but it should add a short brim (see Bern Watts helmet . . . ) to give it a little attitude." (Suppl. Caffrey Decl. Ex. 35). In an August 20, 2009 e-mail asking for feedback on the proposed shape for the Giro Surface, Gravely noted that "it tends toward the Bern in . . . style." (*Id.* Ex. 36, Docket No. 334-6). In response to media inquiries about the difference between the Giro Surface and Bern helmets, Gravely wrote that "to be quite honest, it is a good thing that they are comparing the Surface to the Bern. Bern came into the market a few years ago, and they have been very successful with a niche consumer group because of the unique style offered by the short brim." (*Id.* Ex. 37, Docket No. 334-6).

c. **Smith**

A Smith helmet design brief (which Bern contends is for the Smith Gage helmet) contains references to past Smith helmets and multiple competitor helmets. (Suppl. Caffrey Decl. Ex. 47, Docket No. 334-7). According to the design brief, the goal of the Gage helmet design was to "[c]reate a lifestyle profile to stand out and compete at a saturated, competitive price point. Profile must 'fit' into the look of the category, yet stand out as different and appealing." (*Id.*). The brief stated that "Design should take into consideration relevant competitor profiles. Specific profiles include: Smith Maze, Smith Vantage, Bern Baker, Red Mutiny, See attached document *Profile Design Reference*." (*Id.*). The document noted that the

Bern Baker helmet has a "modern, clearn [sic] profile." (*Id.*). It also stated that Burton's Red Mutiny helmet had a "new, modern profile (BERN-like)." (*Id.*). In a February 22, 2012 e-mail, one of the designers noted that the Gage "helmet, due to its nature, drew primarily from competitive design influence." (*Id.* Ex. 48, Docket No. 334-7). The designer also noted that Smith was "not breaking the mold, but [the Gage] gets the job done." (*Id.*).

### d.    <u>Amer Sports</u>

Amer Sports contends that it is "merely" a distributor of the accused Salomon Helmets. (Aicher Decl. ¶ 2, Docket No. 263). It does not design or manufacture helmets. (*See id.*). As a result, there is no evidence that Amer has copied Bern's design.

### e.    <u>K2</u>

In the beginning of the Rant helmet development, K2 designers created a document referred to as a "benchmarking exercise." (K2 30(b)(6) Dep. by Ambuske 58, Docket No. 334-7; *see* Suppl. Caffrey Decl. Ex. 40, Docket No. 334-6). That document contained images of many different helmets, including the Bern Baker. (*Id.*). Notes from a product planning meeting that took place three years after the Rant helmet was introduced stated that K2 "[w]ill target Bern with Rant" with respect to Norway. (*Id.* Ex. 41, Docket No. 334-6).

### f.    <u>Vans</u>

A 2006-2007 Competitive Analysis by Vans examined helmets by other helmet makers, including BRG, Smith, K2, Boeri, Marker, and Bern. (Caffrey Decl. Ex. 9, Docket No. 254-15). The analysis noted that "Bern is brand new to the helmet market launching their first snow helmet line for the 06/07 season. . . . . They have a new design model in the line that has a built in visor/ball cap bill to give a new look option to helmets." (*Id.*). In an e-mail dated May 10,

2006, a Vans employee suggested that the company had an interest in developing a "visor helmet." (*Id.* Ex. 10, Docket No. 254-4). In that e-mail, the employee mentioned that there was "some thought about a baseball type of helmet like Capix or Bern [h]elmet." (*Id.*). In its product briefs for the Halo project, Vans referred to and included pictures of a variety of competing helmets, including Bern. (*Id.* Exs. 11-13, Docket Nos. 254-4, 254-5). The Halo project led to the development of the Pro-Tec Riot helmet. (Bevens Dep. 108, Docket No. 254-5).

### 4. Simonson Secondary-Meaning Survey

Defendants retained Dr. Itamar Simonson to conduct a consumer survey on the subject of secondary meaning. (Simonson Rept. ¶¶ 11-14, 16, Docket No. 259-1).[4] In April 2014, he used Target Research Group, a marketing-research company, to conduct a survey of more than 250 prospective helmet purchasers in twelve shopping malls around the country. (*Id.* ¶¶ 11, 12, 18, 20, 26). "The survey was designed to test if the trade dress or appearance of the Bern Baker helmet has acquired secondary meaning and is associated in the minds of bike, snow, skate, or water purchasers with a single source (i.e., Bern)." (*Id.* ¶ 11). The survey used the "double-blind" method, whereby neither the interviewers nor the respondents knew the purpose of the study or its sponsor. (*Id.* ¶ 17). Potential respondents were screened to determine if they met certain criteria. (*Id.* ¶ 19).[5] Each survey participant was shown either the Bern Baker helmet or

---

[4] Dr. Simonson is a professor of marketing at the Stanford University Graduate School of Business. (Simonson Rept. ¶ 1). He holds a Ph.D. in marketing from Duke University and an M.B.A. from the UCLA Graduate School of Management. (*Id.* ¶ 2).

[5] Bern contends that the survey "did not identify responders within the relevant universe because it was conducted years after the relevant time period, the time of first infringement." (Pl.'s SMF Opp. Defs.' Combined Mot. Summ. J. ¶ 23, Docket No. 331).

the "control" Bern Brentwood helmet. (*Id.* ¶¶ 12, 17, 22).[6] Survey participants were then asked

whether they associated the appearance of the helmet with any particular company. (*Id.* ¶¶ 13,

16, 24, Ex. F). If they did, they were asked to identify the company or companies. (*Id.* ¶¶ 13,

16, 24, Ex. F).

As part of the survey, 152 respondents were shown the Bern Baker helmet. None

identified Bern as the source of the helmet. (*Id.* ¶¶ 14, 28, Ex. H). Field Solutions, an

independent research firm, conducted a validation survey to confirm that interviews were

conducted and interviewees were qualified to participate in the survey. (*Id.* ¶ 26). "[B]ased on

the unambiguous survey results," Dr. Simonson concluded that the "Bern helmets at issue have

not acquired secondary meaning" and that "the alleged distinctive Bern helmets' trade dress is

not famous." (*Id.* ¶¶ 14, 29, 30).[7]

### D. Evidence as to Counterclaims

As noted, Jonathan Baker designed the Baker helmet. (Baker Decl. ¶ 3, Docket No. 67-

2). In September 2005, Bern began publicly soliciting sales for the Baker helmet. (Key Decl.

Ex. 7, Docket No. 390-7). It first sold the helmet in December 2005. (*Id.*). Design patent

#D572,865S (the "'865 Patent") for the Baker helmet issued on July 8, 2008, from an

application that was filed on January 19, 2007. (Docket No. 1, Ex. A). Jonathan Baker was the

named inventor of the patent. (*Id.*; Baker Decl. ¶¶ 4-7, Docket No. 382).

As noted, the helmet was first sold in December 2005, but the application for a patent

---

[6] Bern contends that the Bern Brentwood helmet is not an appropriate control helmet because it embodies, in part, its trade dress. (Klein Decl. ¶ 31, Docket No. 317). Although the Bern Brentwood shares the same rounded profile as the Bern Baker helmet, Bern contends that a proper control would have neither element of its trade dress. (Klein Decl. ¶ 31).

[7] Bern contends that the survey is irrelevant, and has moved to strike and exclude the survey results. (Pl Bern's Mot Strike Simonson, Docket No. 319).

was not filed until January 2007. Because of the then-applicable public disclosure bar, 35 U.S.C. § 102(b) (2006), which required patent applications to be filed within one year of such sales, the patent was not likely to withstand a legal challenge.

On February 3, 2011, John Phaneuf, a Bern sales representative and investor, wrote an e-mail to Adam Godwin of Bern that stated the following: "I have had an uneasy feeling since Dennis explained to me that we did not file a patent in time for the Visor shape that we invented. Not sure how this happened but it is probably Bern's biggest mistake to date." (Key Decl. Ex. 9, Docket No. 402-8). A January 30, 2011 e-mail from Phaneuf to Bern founder Dennis Leedom asked whether there was "any way to 'modify' our shipping records for the Baker to earn the patent?" (*Id.*).[8]

On April 8, 2014, Jonathan Baker assigned the '865 patent to Bern. (Key Decl. Ex. 1, Docket No. 161-1; Baker Decl. ¶ 7, Docket No. 382)). The assignment purported to be retroactive to January 19, 2007. (*Id.*). On April 11, 2014, Bern filed a statutory disclaimer of the '865 patent with the United States Patent and Trademark Office ("USPTO") under 35 U.S.C. § 253. (Caffrey Decl. Ex. 1, Docket No. 183). The USPTO accepted the disclaimer on May 13, 2014. (Second Caffrey Decl. Ex. 1, Docket No. 211).

Bern contends that Baker previously assigned his rights in the Baker patent before the application was submitted, but that the signed documents cannot be located. Defendants dispute that contention. However, if Bern did not own the patent at the relevant time, Baker did. Bern had contracted with Baker's company to do the design work for the helmet. (Baker Decl. ¶ 3,

---

[8] Godwin, who was Bern's Rule 30(b)(6) deposition witness, testified that his understanding of the design patent as of February 3, 2011, was that "it would be very difficult to enforce." (Bern 30(b)(6) Dep. by Godwin 407-08).

Docket No. 382). Baker had always understood that any intellectual property rights resulting from his design work belonged to Bern. (*Id.* ¶ 4).

Bern referred to the '865 patent in its marketing materials on multiple occasions. Bern's 2013/2014 Winter Collection Catalog, 2014 Skate Collection Catalog, 2014 Bike Collection Catalog, and 2014 H20 Collection Catalog all included logos that stated "the original" above text that stated "visor shell patent #US D572,865S." (Key Decl. Exs. 11, 12, 14, 15, Docket No. 390). The 2013/2014 Winter Collection Catalog also included an actual excerpt from the '865 patent. (*Id.* Ex. 11). The 2014 Skate Collection Catalog stated that Bern's "patented integrated cap style visor and hard visor shell shape have been imitated but never replicated. Almost every brand in the market now has a brim, but your customer wants the original." (*Id.* Ex. 12). That catalog also included logos that refer to "The Original Visor Patent #US D,572,865." (*Id.* Exs. 12, 13). The 2014 H20 Collection Catalog included the same logos. (*Id.* Ex. 15). The catalogue also states that Bern's "patented hard visor shell shape has been imitated but never replicated. Almost every brand in the market now has a brim, but your customer wants the original." (*Id.* Ex. 15).

There were also multiple references to the patent on Bern's website. As of February 25, 2014, the website stated that the "Baker is the original Bern visor lid. (Patent # US D572,865S)." (*Id.* Ex. 16A). It referred to the Watts helmet as the "successor to Bern's original visor lid (the Baker - patent # US D572,865 S)." (*Id.*). Trade-show banners also included the phrase "the original" with the patent number below it. (*Id.* Ex. 17).

Internal Bern documents indicate its marketing strategies at various points for promoting its brand to distributors. In a document titled "Overview of Bern 2012 Snow Line and Two-

Pronged Sales Plan," Bern described its goals, improvements to its helmets, information about its market share, and the allegation that competitors have "knocked off" Bern. (*Id.* Ex. 18). E-mails and other internal documents also indicate that Bern's strategy to promote its brand included informing retailers that Bern was the original and that retailers should avoid stocking knock-off brands. (*Id.* Exs. 19-23). The same documents indicate that Bern wanted to "provide a formula / incentive to influence retailer to not buy knock off lids (Giro Visor, Red Mutney [sic], Salamon Visor [sic], Protech Visor) but buy the original—Bern." (*Id.* Ex. 22; *see* Exs. 19-21, 23). A Bern representative stated that the company's "intention was to help educate retailers about our patent and to try to get them to place their buy for visor lids with us and not our competitors." (Bern 30(b)(6) Dep. by Godwin 398:5-7, Ex. 402-9).

E.    **Procedural Background**

Bern initially brought suit for design-patent infringement against Burton on December 20, 2011. The original complaint alleged that Burton had infringed the '865 patent. On April 27, 2012, Bern filed an amended complaint, adding four defendants and changing its claims from patent infringement to trademark infringement. It dropped its patent-infringement claims entirely.

On September 28, 2012, defendants moved for summary judgment on the ground that Bern could not prevail because it could not prove the non-functionality of its asserted trade dress. The Court denied that motion on May 15, 2013.

On July 11, 2013, after obtaining leave of court, Bern filed a second amended complaint adding two defendants. The second amended complaint alleged trade-dress infringement under 15 U.S.C. § 1125(a) and Massachusetts common law; trade-dress dilution under 15 U.S.C. §

1125(c) and Mass. Gen. Laws ch. 110H, § 13; and unfair competition under Mass. Gen. Laws ch. 93A. The second amended complaint did not allege any claims of patent-law violations.

On March 7, 2014, again after obtaining leave of court, Bern filed a third amended complaint adding additional allegedly infringing helmets introduced by defendants after the inception of the case.

On March 24, 2014, defendants filed answers to the third amended complaint. For the first time, defendants asserted counterclaims with their answers. With one partial exception, the counterclaims brought claims for (1) a declaratory judgment that the '865 patent is invalid, (2) a declaratory judgment that Bern cannot enforce the '865 patent because of its inequitable conduct, (3) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), (4) common-law unfair competition, and (5) unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.[9]

On April 14, 2014, Bern filed a motion to strike the counterclaims (or, in the alternative, to sever them) on the grounds that (1) defendants were required to seek leave of Court to amend their answers to add new counterclaims; (2) the declaratory-judgment claims are moot because Bern disclaimed the '865 patent; and (3) the false advertising, unfair competition, and Chapter 93A counterclaims fail to state a claim upon which relief can be granted. On June 12, 2014, the Court granted the motion to strike as to certain counterclaims (the declaratory judgment act counterclaims and the Lanham Act, common-law unfair competition, and Chapter 93A counterclaims that were based on allegations of puffery), and otherwise denied the motion.

On June 3, 2014, Vans moved for summary judgment on the grounds that Bern's trade dress does not have secondary meaning, and in any event, no reasonable juror could find a

---

[9] K-2 did not assert either of the declaratory-judgment claims or the common-law unfair competition claim.

substantial likelihood of confusion between the accused Pro-Tec helmet and Bern's helmet.

On July 28, 2014, Burton, BRG, Amer Sports, K-2, and Smith moved for summary judgment on the grounds that Bern cannot prove (1) that its trade dress has acquired secondary meaning and (2) that its trade dress is non-functional. On the same day, Burton, BRG, Amer Sports, K-2, and Smith each filed separate motions for summary judgment on the issue of likelihood of confusion. They also moved to strike and exclude the expert opinion of David Rogers on the subject of functionality. The next day, Vans filed a notice that it was joining defendants' combined motion for summary judgment on the issues of secondary meaning and functionality.

On July 29, 2014, Vans filed a motion to strike five declarations that Bern submitted in opposition to its motion for summary judgment as untimely. On that same day, the other five defendants moved to join the motion to strike.

On September 5, 2014, Bern moved to strike the expert reports of Dr. Simonson on the issues of secondary meaning and likelihood of confusion, and otherwise to exclude his opinions and testimony.

On December 22, 2014, Bern moved for summary judgment on defendants' counterclaims on the grounds that (1) defendants have not produced evidence of materiality and (2) they have not provided evidence of causation or damages.

## II.    <u>Motions To Strike and Exclude</u>

As a general matter, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). Under Fed. R. Civ. P. 56(c)(4), affidavits, although not themselves

admissible at trial, may be offered in support of (or opposition to) summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *Garside*, 895 F.2d at 49-51. A motion to strike is the proper vehicle for challenging the admissibility of evidence offered at the summary judgment stage. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994).

A. **Declarations Submitted by Bern**

Defendants have moved to strike and exclude the declarations of five witnesses (Mitchell, Sadr, Denis, Shaw, and Montani) on the ground that Bern failed to identify those individuals as witnesses in accordance with the discovery rules.

Fact discovery in this case took place between July 2012 and March 28, 2014. It is undisputed that in its initial disclosures, Bern did not list any of the five declarants as persons having discoverable information. (Stier Second Decl. Ex. A 1-2, Docket No. 297). It is also undisputed that Bern never supplemented its initial disclosures to identify the five witnesses. Bern acknowledges that it identified the witnesses for the first time on July 15, 2014, in its opposition to the motion of defendant Vans for summary judgment.

It does not appear to be disputed that the five individuals are significant witnesses, at least in this specific respect: Bern is relying on the declarations of those witnesses to defeat summary judgment.

Under Rule 26(e), a party must supplement or correct a disclosure made under Rule 26(a) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

Fed. R. Civ. P. 26(e).  Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 37 contemplates strict adherence to the discovery requirements; furthermore, "the required sanction in the ordinary case is mandatory preclusion" of the untimely disclosed information.  *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998).  However, Rule 37(c)(1) contains a "narrow escape hatch" that allows courts to admit untimely evidence if the proponent's failure to reveal it was either substantially justified or harmless.  *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001).  The non-disclosing party carries the burden of proving substantial justification or harmlessness.  *Alves v. Mazda Motor of America, Inc.*, 448 F. Supp. 2d 285, 293 (D. Mass. 2006).

Bern contends that it timely disclosed the five declarants when it first determined the need to call them at trial.  It contends that such a need arose in response to the argument made by Vans in its motion for summary judgment that Bern's trade dress has not acquired secondary meaning.  Although Bern acknowledges that Vans had previously asserted an affirmative defense stating that the trade dress was "not distinctive," it contends that the motion for summary judgment is "notably more specific."  (Pl. Bern's Opp. Mot. Strike 1, Docket No. 305).

Bern, however, has it backwards.  Defendants do not need, and have never needed, to prove that Bern's trade dress *was not* distinctive.  Instead, Bern must prove its trade dress *was* distinctive because it acquired secondary meaning.  *See Yankee Candle Co. v. Bridgewater Candle Co.,* 259 F.3d 25, 38 (1st Cir. 2001).  More particularly, because Bern's trade-dress

claims are based on "product design/configuration," its trade dress is distinctive only if it "has acquired distinctiveness" by developing "secondary meaning." *Wal-Mart Stores v. Samara Bros, Inc.* 529 U.S. 205, 210-15 (2000); *Yankee Candle*, 259 F.3d at 40. And the plaintiff has the burden of proof as to secondary meaning. *See Yankee Candle Co.*, 259 F.3d at 40-41, 43-45. It is certainly true that this issue has arisen in a somewhat unique context. The witnesses in question are not percipient witnesses in the normal sense—there is no discrete event or activity that they perceived—nor are they expert witnesses. In theory, at least, anyone who ever saw or used a Bern helmet was a potential witness. But neither are those witnesses insignificant. Bern has had the burden of proving secondary meaning from the outset, and it has chosen not to rely on survey evidence. That means that Bern elected to rely on the evidence of testifying witnesses. It selected those five witnesses, and those witnesses alone, to give sworn statements in an effort to defeat summary judgment.

Accordingly, Bern has not established either that the identification of the witnesses was timely or that the late identification was justified. In determining whether that failure was harmless, the Court must balance "a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects." *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 191 (1st Cir. 2006) (quoting *Macauley v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003)). The element of surprise should also be considered. *Id.* Those factors do not weigh in Bern's favor.

First, discovery closed on March 28, 2014. Bern submitted the declarations for the first time on July 15, 2014, more than three months after the close of discovery.

Second, although the evidence represents Bern's only direct evidence of secondary meaning, the potential need for such evidence was entirely predictable. As noted, Bern has always had the burden to prove secondary meaning. If Bern was not going to prove secondary meaning through survey evidence, it should have foreseen that witness testimony would be required.

Third, the weight of the witnesses' evidence is limited. Of the five witnesses, three are retailers. Evidence that a retailer views the trade dress as distinctive is not probative of secondary meaning. *Yankee Candle*, 259 F.3d at 43 n.14. Even if the two remaining declarations were admissible, they do not demonstrate "that a significant portion of the consuming public connects [the mark] exclusively with [Bern], which is the critical inquiry." *See Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 2011 WL 6812642, *7 (D. Mass. Dec. 28, 2011). The evidence of two seemingly random (or, perhaps, not random) customers, without more, is very weak direct evidence. Indeed, Bern barely relies on the challenged declarations in its briefing.

Fourth, as previously explained, Bern's proffered justification for the late disclosure was unsatisfactory.

Fifth, defendants' ability to overcome the adverse effects of the declarations is limited at best. Defendants did not receive the declarations until more than three months after discovery had been closed. This case is more than three years old. Among other things, defendants have lost the opportunity to depose the witnesses, and to explore exactly how it was Bern came to select them as witnesses, and the factual basis of their statements. Bern contends that Vans conceded that it has not been materially prejudiced by the submission of these declarations

because the new declarations only make up a small portion of its evidence. But whether the declarations are a small portion of the evidence or not, without a satisfactory justification for Bern, any prejudice to defendants is too much.

Bern also contends that defendants cannot complain about prejudice because Bern "is not the only party to submit new declarations of fact witnesses after the close of discovery in connection with summary judgment motions." (Pl. Bern's Opp. Mot. Strike at 2). To support that contention, Bern points to defendants' submission of "six new declarations of fact witnesses with their summary judgment motions, well after the close of discovery." (*Id.* at 4). However, the fact that defendants also may have submitted untimely declarations does not absolve Bern of its own untimeliness.[10] Rather, if Bern believes that defendants' declarations are untimely, it could have filed its own motion to strike.

In short, the disclosure of the witness was not timely, not substantially justified, and not harmless. Accordingly, defendants' motion to strike and exclude the declarations and testimony of Mitchell, Sadr, Denis, Shaw, and Montani will be granted.

## B.    Expert Testimony

The admissibility of expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence.[11] The adoption of Rule 702 in its present form codified the standard of

---

[10] Defendants contend that it "disclosed all of the witnesses Bern lists multiple times during discovery, and all these witnesses were deposed or available for deposition." (Defs.' Reply Support Mot. Strike Declarations 1-2, Docket No. 327). Because the Court finds that Bern's argument is irrelevant, the Court makes no judgment at this time as to the timeliness of defendants' own submissions.

[11] Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

admissibility for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597).  That gatekeeping function requires that the Court consider three issues:  (1) whether the proposed expert is qualified by "knowledge, skill, experience, training or education;" (2) whether the proposed subject matter of the expert opinion properly concerns "scientific, technical or other specialized knowledge;" and (3) "whether the testimony is helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case."  *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1996).  The motions at issue in this case all relate to the third issue:  the reliability of the experts' proffered testimony.

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry."  *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  That requirement ensures that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that [the] reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.  In other words, Rule 702 requires the court to "ensure that there is an adequate fit between the

---

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591). Significant analytical gaps between the data and the opinion proffered by an expert may undermine the reliability of an expert's testimony. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may choose to exclude an expert's opinion when it is "based on conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted), or when it is "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 U.S. at 146.

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

### 1.    Defendants' Motion to Exclude Rogers Opinion

Plaintiff has offered David Rogers as an expert in the field of helmet design to provide an opinion as to whether the Bern trade dress provides a function to the wearer. (Rogers Rept. ¶ 2, Docket No. 258-8). Defendants moved to strike and exclude his expert opinion on the grounds that (1) his report "primarily focuses on an irrelevant functionality analysis relating to regulatory compliance; and (2) all remaining conclusions are entirely unsupported by any facts, data, testing, analysis, or repeatable protocols." (Defs.' Br. Support Mot. Strike Rogers 4,

Docket No. 267). Because the Court will not reach the issue of functionality, it does not need to resolve whether the report should be excluded. Accordingly, the motion to exclude will be denied as moot.

### 2. Plaintiff's Motion to Exclude Simonson Reports

Bern has moved to exclude Dr. Simonson's report on the subject of secondary meaning and his rebuttal report on likelihood of confusion.

### a. Survey on Secondary Meaning

Secondary meaning must be established at the time of infringement. *Commerce Nat'l Ins. Serv., Inc. v. Commerce Ins. Agency*, 214 F.3d 432, 438-40 (3d Cir. 2000). Bern contends that Simonson's expert report on secondary meaning is irrelevant because it was taken in 2014, and not at the time of first infringement. Defendants concede that Bern must prove secondary meaning "as of the time any [d]efendant first began selling the accused helmets," but defendants contend "that proposition does not render the survey inadmissible." (Defs.' Opp. Mot. Strike Simonson 1-2, Docket No. 343).

It is clearly established that survey evidence is the "preferred" manner of demonstrating secondary meaning. *Yankee Candle*, 259 F.3d at 39. Along with testimony by individual consumers, customer surveys are the only direct evidence probative of secondary meaning. *Id.* at 43. Under Bern's theory, a company would have to undertake a preemptive survey prior to the time they allegedly first infringe, or the survey evidence would not be admissible. Such a requirement would be absurd, and would make it nearly impossible for defendants ever to present the "preferred" form of evidence.

Thus, courts have routinely admitted such evidence and examined the timing to determine the strength of the evidence. *See General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006); *I.P. Lund Trading ApS v. Kohler Co.*, 118 F. Supp. 2d 92, 106 (D. Mass. 2000). In *General Motors*, the Sixth Circuit determined that a "court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement." 468 F.3d at 419. In that case, the court found that plaintiff's consumer surveys conducted in 1999 and 2002 provided "strong statistical evidence" to support secondary meaning in 1992. *Id.* The court held that in light of that "strong survey evidence . . . [,] summary judgment was appropriate as to the issue of secondary meaning." *Id.* at 420. Likewise, in *I.P. Lund*, the court allowed three consumer surveys from 1999 as evidence of secondary meaning as of 1996. 118 F. Supp. 2d at 106.

Bern cites the Third Circuit's decision in *Commerce National Insurance*, 214 F.3d at 440, in support of its contention that the survey is irrelevant. The court in that case found that a then-recent customer satisfaction survey was "wholly irrelevant" as to whether the plaintiff had achieved secondary meaning as of the date of infringement. *Id.* Although the court found that the recency of the survey made it "not particularly probative of customer views" as of the relevant date, it "more importantly" found the survey irrelevant because it was a customer satisfaction survey that did "little to demonstrate" secondary meaning. *Id.* To the extent that the court found the survey irrelevant based on its timing, it appears to be against the weight of authority and wrongly decided. To the extent that it involved a different type of survey, it is irrelevant. *Commerce National Insurance* therefore does not support Bern's contention that

defendants' survey is irrelevant.  Bern has pointed to no authority where a secondary-meaning survey was excluded solely on the basis of its timing.

Because of the important evidentiary role that consumer surveys play in determining secondary meaning, and the impracticality of requiring that consumer surveys be conducted before the alleged infringement occurs, Dr. Simonson's survey will not be excluded.  The time between alleged infringement and his survey will be taken into account when determining the strength of the evidence.

Accordingly, Dr. Simonson's report on the subject of secondary meaning will not be excluded.

### b.    <u>Survey on Consumer Confusion</u>

Plaintiff next contends that Simonson's rebuttal survey on likelihood of confusion should be excluded because he used an improper choice of interview methodology, improper pre-stimulation array, incorrect universe of respondents, unrealistic testing conditions, improper question wording, small sample size, and improper data collection procedures.  In support of its motion to exclude the rebuttal survey, plaintiff submitted a declaration from its expert Robert Klein.[12]  Because the Court will not reach the issue of likelihood of confusion, it does not need to resolve whether the Simonson rebuttal should be excluded.  Accordingly, the motion to exclude will be denied as moot.

### III.    <u>Legal Standard for Summary Judgment</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d

---

[12] Defendants contend that Klein's declaration is untimely because it contains rebuttal opinions.  Because the Court will not exclude Simonson's expert report, the Court will not rule on the timeliness of Klein's declaration at this time.

816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate

when the moving party shows that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule

56[] mandates the entry of summary judgment 'against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115,

1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making

that determination, the court must view "the record in the light most favorable to the

nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20,

25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes omitted).  The non-

moving party may not simply "rest upon mere allegation or denials of his pleading," but instead

must "present affirmative evidence."  *Id*. at 256-57.

## IV.  Defendants' Motion for Summary Judgment

Plaintiff has brought both federal and state trade-dress claims.  The federal claims are

brought pursuant to the Lanham Act, which provides protection against "trade dress"

infringement and dilution.  15 U.S.C. § 1125(a), (c).

As a general matter, trade-dress claims are difficult to establish.  In substance, and as set

forth below, the plaintiff must establish that the design and appearance of its products identify

those products as coming from a particular source.  It is not enough to show that competitors, in

response to the success of plaintiff's particular design, began marketing products that were

similar.  In a product-design case, the plaintiff must prove that the design has acquired

"secondary meaning"—in other words, that a significant portion of the consuming public

connects the product design with the source of the product (that is, the plaintiff).  Unless that

secondary meaning is proved, the plaintiff company does not have an actionable claim against

its competitors, even if their designs were clearly efforts to mimic or follow the style set by the

plaintiff.

## A.    Trade-Dress Claims

"Trade dress" is defined as "the design and appearance of a product together with the

elements making up the overall image that serves to identify the product presented to the

consumer."  *Yankee Candle*, 259 F.3d at 37-38 (quoting *Chrysler Corp. v. Silva*, 118 F.3d 56,

58 (1st Cir. 1997)) (internal quotation marks omitted).  Trade-dress protection is intended "to

protect that which identifies a product's source." *Id.* at 38 (citing *I.P. Lund Trading ApS v.*

*Kohler Co.*, 163 F.3d 27, 35 (1st Cir. 1998)).  Plaintiffs can bring trade-dress claims "based

both on product packaging and on 'product design/configuration.'" *Id.* (citing *Wal-Mart Stores*

*v. Samara Bros, Inc.*, 529 U.S. 205, 213-14 (2000)).

In order to prevail on a claim of trade-dress infringement, a plaintiff must prove that the

trade dress is (1) distinctive and (2) non-functional, and (3) that "another's use of a similar trade

dress is likely to cause confusion among consumers as to the product's source."  *Id.* (citing *I.P.*

*Lund*, 163 F.3d at 36, 43-44).

### 1.    Whether the Trade Dress Is Distinctive

A trade dress is distinctive if it is either (1) "inherently distinctive" or (2) "has acquired

distinctiveness" by developing "secondary meaning."  *Wal-Mart*, 529 U.S. at 210-11; *see also*

*Yankee Candle*, 259 F.3d at 38. It is inherently distinctive when the "intrinsic nature [of the trade dress] serves to identify a particular source." *Yankee Candle*, 259 F.3d at 38 (alterations in original) (quoting *Wal-Mart*, 529 U.S. at 210). It has developed "secondary meaning" when "in the minds of the public, the primary significance of [it] is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982)) (internal quotation marks omitted).

It is undisputed that Bern's trade-dress claims are based on "product design/configuration." The Supreme Court has held that a product design may never be inherently distinctive because "even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Wal-Mart*, 529 U.S. at 212-14; *see also Yankee Candle*, 259 F.3d at 40. Bern's trade-dress therefore is distinctive only if it had developed secondary meaning at the time of the first alleged infringement, which happened in early 2007. *See Yankee Candle*, 259 F.3d at 40 (citing *Wal-Mart*, 529 U.S. at 215); *Commerce National Insurance*, 214 F.3d at 438-40.

The issue here is whether Bern "has introduced sufficient evidence to survive summary judgment on the question of secondary meaning." *Yankee Candle*, 259 F.3d at 43. It is well-established that "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Id.* (alterations in original) (quoting *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993)).

### a.    Direct Evidence of Secondary Meaning

Consumer surveys and testimony by individual consumers are the only types of direct evidence probative of secondary meaning. *Yankee Candle*, 259 F.3d at 43. Bern has no direct evidence of secondary meaning. It has introduced no survey evidence, and has no admissible evidence that individual consumers associate the particular features at issue with Bern.

The Court has excluded the five declarations submitted by Bern in support of its opposition to the motions for summary judgment. However, even if the Court were to consider those declarations as evidence, three of them are by retailers. As noted, evidence that a retailer views the trade dress as distinctive is not probative of secondary meaning. *Yankee Candle*, 259 F.3d at 43 n.14. And even if the two remaining declarations were considered, they do not demonstrate "that a significant portion of the consuming public connects [the design] exclusively with [Bern], which is the critical inquiry." *See Unleashed Doggie Day Care*, 2011 WL 6812642, at *7. The size of the helmet market is unclear from the record, but surely two individuals represent only a tiny fraction of that market, and there is nothing in the record to suggest that those two are in some way representative of the market as a whole.

Bern contends that statements by professional athletes Parker Cook and Tarjei Sporastoyl constitute direct evidence of secondary meaning. Those declarations contain the following identical language: "I have chosen to wear Bern's helmets because of their distinctive style, which is created by the profile of the helmet and the narrow visor or brim." (Cook Decl. ¶ 2, Docket No. 67-6; Sporastoyl Decl. ¶ 2, Docket No. 67-7). While those declarations indicate that the two athletes believed that the helmets had a distinctive style, they

say nothing about connecting that style to the source of the product. *See Wal-Mart*, 529 U.S. at 212-14. The declarations therefore do not provide evidence of secondary meaning.

Furthermore, the declarations are dated 2012, and do not indicate when the declarants began wearing Bern helmets. Bern must prove that its product has acquired secondary meaning before defendants began using the same or similar products. *Commerce National Insurance*, 214 F.3d at 438-40. As noted, defendants began selling the first of their accused products in 2007.[13] Even if timely, the identical comments of two professional athletes simply do not demonstrate "that a significant portion of the consuming public connects [the mark] exclusively with [Bern], which is the critical inquiry." *See Unleashed Doggie Day Care*, 2011 WL 6812642, at *7.

In contrast, defendants have submitted Dr. Simonson's survey, in which zero out of 152 respondents identified Bern as the source of a Baker helmet. (Simonson Rept. ¶¶ 14, 28, Ex. H). Based on those results, Simonson concluded that Bern's alleged trade dress has not acquired secondary meaning. (*Id.* ¶¶ 14, 29, 30). Although Dr. Simonson's survey is from 2014, and not before infringement occurred, it is still probative as to whether the "primary significance of [Bern's helmets] is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211. Again, it would be absurd to require defendants to conduct surveys as to secondary meaning prior to being accused of infringement.

---

[13] There is some disagreement between parties as to what year is the relevant year for proving infringement. Although some defendants did not release their allegedly infringing products until later years, 2007 is the year when Bern allegedly lost its exclusive hold on the market. As a result, due to the "vigorous evidentiary requirements" of proving secondary meaning, it is logical that secondary meaning would have to be established by the earliest date that any defendant infringed. Accordingly, Bern must prove secondary meaning as of 2007.

Even if the Court were to use different years for the various defendants, the alleged infringements occurred at the latest in 2007 (K2 and Amer Sports), 2008 (Burton), 2010 (BRG), 2011 (Vans), and 2012 (Smith). Bern has produced no direct evidence of secondary meaning as of any of those dates.

### b.   Circumstantial Evidence of Secondary Meaning

The absence of direct evidence is not necessarily fatal to Bern's case.  Bern can also

prove secondary meaning through circumstantial evidence.  *Yankee Candle*, 259 F.3d at 43.

Among the factors courts generally look to as circumstantial evidence in determining whether a

term has acquired secondary meaning are

> [1] the length and manner of the use of the trade dress, [2] the nature and extent of
> advertising and promotion of the trade dress, . . . [3] the efforts made to promote a
> conscious connection by the public between the trade dress and the product's
> source[,] . . . [4] the product's 'established place in the market' and [5] proof of
> intentional copying.

*Id.* at 43-44.

### (1)   Length and Manner of the Use of the Trade Dress

The first factor is the length and the manner of the use of the trade dress.  The longer the

period of exclusivity, the stronger the evidence that a product has acquired secondary meaning.

*See Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 231 (D. Mass. 2010); *I.P.*

*Lund*, 118 F. Supp. 2d at 111 (explaining that evidence of long and exclusive use provides

evidence in favor of secondary meaning); *see also 165 Park Row, Inc. v. JHR Development,*

*LLC*, 967 F. Supp. 2d 405, 413 (D. Me. 2013).

Bern began selling the Baker helmet between December 2005 and January 2006.  By

January 2007, K2 had begun selling its Rant helmet to dealers, and Burton had introduced its

Mutiny Red helmet at a trade show.  By the end of 2007, both K2 and Amer Sports had begun

selling their alleged infringing helmets to consumers.  As a result, Bern's product was on the

market for barely more than a year by the time competitors were selling allegedly infringing

products. If the Bern trade dress did in fact acquire a secondary meaning, it had to do so in a very short period of time. Therefore, that factor does not weigh in Bern's favor.

(2) <strong><u>Advertising, Marketing, Product Success</u></strong>

The second, third, and fourth factors are "the nature and extent of the advertising and promotion of the trade dress," "the efforts made to promote a conscious connection by the public between the trade dress and the product's source," and "the product's established place in the market." Those factors will be analyzed together.

Bern contends that it has spent more than $1 million on advertising, marketing, and promoting its helmets. However, that number describes the amount spent between January 2005 and December 2012. As noted, Bern must prove secondary meaning by the time of the first alleged infringement in 2007. Bern spent $10,397 in 2005, $24,532 in 2006, $96,369 in 2007, $147,558 in 2008, $139,945 in 2009, $213,636 in 2010, $237,585 in 2011, and $227,064 in 2012. Therefore, of the $1.1 million spent on marketing, no more than twelve percent of that amount—about $131,000—had been spent prior to the introduction of the first infringing products. The numbers do not capture what percentage of the marketing went to promoting helmets that embodied Bern's trade dress, or what percentage occurred after Burton and K2 had come out with competing helmets in January 2007.

Bern further contends that its advertising has focused on the distinctive profile of its helmets. Dates are missing from many of the advertisements submitted by Bern, although it is true that the advertisements include pictures of the helmet. (*See* Godwin Decl. Ex. 2). The type of advertising that is relevant is "advertising that specifically directs a consumer's attention to a particular aspect of the product. . . . Merely 'featuring' the relevant aspect of the product in

advertising is no more probative of secondary meaning than are strong sales." *Yankee Candle*, 259 F.3d at 44. The advertising submitted by Bern does not call attention to the short brim or the rounded shape. Of the 32 pages of advertisements featured in Exhibit 2 to Godwin's declaration, it is not obviously apparent that any one of them specifically mentions the Bern trade dress or "directs consumer's attention to a particular aspect of the product."[14]

Bern has also sponsored at least 50 professional athletes who have worn its helmets at "highly-publicized professional athletic events." (Pl.'s SMF Opp. Vans' Mot. Summ. J. ¶ 43 (citing Godwin Decl. ¶ 4, Ex. 3)). Those athletes include Olympic medal winners such as Seth Wescott and Lindsey Jacobellis. (Godwin Decl. ¶ 4, Ex. 3). The record does not indicate, however, when Bern started sponsoring those athletes. The record therefore does not indicate whether those sponsorships occurred at the relevant time to establish secondary meaning.[15]

Bern also points to evidence of its market success. "Sales success by itself 'will not be as probative of secondary meaning in a product configuration case . . . since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designing capacity of the supposedly distinguishing feature or combination of features.'" *Yankee Candle Co., Inc. v. Bridgewater Candle Co., Inc.*, 99 F. Supp. 2d 140, 155 (D. Mass. 2000) (quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1452 (3d Cir. 1994)). According to Bern, from 2006 to 2010, it experienced annual growth of

---

[14]All parties have submitted copies of other advertising materials in connection with the issues of functionality and Bern's motion for summary judgment on defendants' counterclaims. Bern only points to the advertising in Exhibit 2 of the Godwin Declaration in support of its contention that its alleged trade-dress has acquired secondary meaning. In any event, the advertising related to the counterclaims is not from the relevant time period when secondary meaning would have had to be established.

[15] As noted, the only two declarations Bern has submitted to support the contention that athletes chose to wear its helmets because of their distinctive style are dated 2012, and do not indicate when the declarants began doing so.

approximately 45 percent in total revenues from all products, and approximately 46 percent compounded annual growth in revenues from brim-style helmets. Over that five-year period, its sales-unit volume grew at a rate of 39 percent annually for all products and 38 percent annually for brim-style helmets. Since its launch, Bern has sold more than 726,000 brim-style helmets in 47 countries worldwide. Those sales add up to total revenue of $22 million.[16] However, less than 82,000 brim-style helmets, grossing less than $1.4 million, had been sold by the end of 2007. Although Bern's market success is notable, absent evidence connecting it to the desirability of the alleged Bern trade dress, that evidence is not particularly probative of secondary meaning. Also, due to the short time of exclusivity, those numbers do not prove that the design achieved secondary meaning by the time of the first alleged infringement.

Finally, Bern has submitted copies of articles that appeared in various publications profiling its helmets. However, only one article bears a date before January 2007, and it appears to merely mention the brim in passing. Of the remaining articles, eight do not appear to have dates and six appear to have dates ranging from September 2007 to Fall 2012. The majority of these articles appear to focus on functional aspects or other features, and make no mention of the alleged distinctive features of the product design at all. Bern has also included in the record comments from on-line reviewers and retailers concerning its unique style and efforts of competitors to copy it. However, these entries all appear to be dated 2012 or later.

In short, the evidence as to Bern's advertising and marketing efforts and the success of its product does not tend to prove that secondary meaning had been established by early 2007.

---

[16] According to Bern, the day after Seth Wescott won an Olympic gold medal wearing a Bern Baker helmet in January 2006, the number of visitors to Bern's website was 9,800. This compared to an average of 120 visitors per day leading up to Wescott's gold medal victory.

### (3)    <u>Evidence of Intentional Copying</u>

The fifth factor is proof of intentional copying. *Yankee Candle*, 259 F.3d at 43-44; *I.P. Lund*, 118 F. Supp. 2d at 113. "To prove intentional copying, [the plaintiff] must show that [defendants] intentionally copied 'down to the smallest detail' the [product] design." *I.P. Lund*, 118 F. Supp. 2d at 113-14 (quoting *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 927 F. Supp. 528, 534 (D. Mass. 1996)). The First Circuit has determined that "intent plays a particularly minor role in product design/configuration cases." *Yankee Candle*, 259 F.3d at 45; *see also Duraco Products*, 40 F.3d at 1453 ("[Attempts to copy a product configuration [may] not be probative [because] the copier may well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product."). "The inference of unfair competition will be even weaker where the copier takes conspicuous steps—whether in packaging, trademark, marketing techniques, or otherwise—to distinguish its product from its competitor's." *Duraco Products*, 40 F.3d at 1453. Furthermore, "the relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another." *Yankee Candle*, 259 F.3d at 45 (citing *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986)).

In its opposition, Bern relies primarily on what it refers to as evidence of "rampant, intentional copying." However, an examination of the documents that Bern has submitted reveals nothing more than typical—and legitimate—marketplace behavior. It is perfectly appropriate for companies to respond to competitive forces in the marketplace, including any sudden shifts in fashion triggered by a competitor's introduction of a successful new product.[17]

---

[17] Not surprisingly, Bern itself analyzed a variety of sources when designing the Baker helmet, including other helmets in the market. (Bern 30(b)(6) Dep. by Godwin 88-89, Docket No. 323; Hanewicz Decl. Ex. 10, Docket Nos. 323-2, 323-3, 323-4).

If a competitor introduces a product with a feature that consumers find desirable, it is acceptable for companies to want to design a similar feature. Mere similarity of design is not improper.

Although there is evidence that Bern helmets were considered in defendants' design efforts, there is no evidence of any intentional copying. For example, various internal documents produced by Vans survey the competitive landscape to take into account helmets by other helmet makers, including BRG, Smith, K2, Boeri, Marker, and Bern. (Caffrey Decl. Ex. 9). Likewise, language used in e-mails and design briefs regarding Bern indicate a desire to take into account Bern's design and compete with it. Similar documents exist for other defendants. Bern has not pointed to a single example where defendants did not include their own marks or names on their helmets. Nothing in the record indicates any actual copying, or indeed anything more than normal competitive behavior.

In short, Bern has not produced evidence to support a theory that defendants copied its design to "pass off" their goods as those of Bern's. Accordingly, Bern's evidence of internal copying is not "sufficiently probative of secondary meaning." *See Yankee Candle*, 259 F.3d at 45.

### (4) <u>Weighing the Factors</u>

This case is similar to *Yankee Candle*, where the First Circuit upheld the granting of a motion of summary judgment on a claim of trade-dress infringement. The plaintiff in *Yankee Candle* offered evidence of an advertising campaign, "its continuous and virtually exclusive use of its trade dress," high sales figures, internal files from defendant "indicating that retailers identify a resemblance between" plaintiff and defendant's styles, testimony from defendant's

employees as to the distinctiveness of the claimed trade dress, and evidence of intentional copying.  259 F.3d at 43.  Nonetheless, that was not enough.

Here, Bern has presented evidence of its advertising and marketing efforts, sales growth, positive reviews and press coverage, internal files from defendants identifying the uniqueness of the Bern style, and alleged evidence of intentional copying.  Both here and in *Yankee Candle*, plaintiffs had no direct evidence of secondary meaning.  Unlike *Yankee Candle*, there is direct evidence of a *lack* of secondary meaning, in the form of a consumer survey.  As in *Yankee Candle*, the absence of direct evidence supporting Bern's case "renders [its] circumstantial evidence insufficient for a reasonable juror to find that the trade dress has acquired a secondary meaning."  *Id.* at 45.

Accordingly, Bern "has not met the vigorous evidentiary showing" required to prove trade-dress infringement and defeat summary judgment.  *See id.* at 43.  Defendants' motions for summary judgment will therefore be granted.

### 2.      Functionality

In order for trade dress to be protected, the plaintiff must prove that the dress is, among other things, non-functional.  *Yankee Candle*, 259 F.3d at 38.  The Court has previously denied defendants' motion for summary judgment on that issue, which was based on the assertion that the Bern trade dress served a functional purpose.   In any event, because the Court has determined that Bern's alleged trade dress lacks secondary meaning, the Court need not reach that issue here.

### 3.      Likelihood of Confusion

In order to prevail on a claim of trade-dress infringement, a plaintiff must prove that "another's use of a similar trade dress is likely to cause confusion among consumers as to the

product's source." *Yankee Candle*, F.3d at 38. To determine whether there is a likelihood of confusion of two competing marks, the Court should consider the following factors:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. . . . No one factor is necessarily determinative, but each must be considered.

*I.P. Lund*, 163 F.3d at 43.

Because the Court has determined that Bern's alleged trade dress lacks secondary meaning, the Court need not reach the issue. Accordingly, the motions for summary judgment on grounds of lack of evidence of likelihood of confusion will be denied as moot.

### B.  Dilution

Count 2 asserts claims under the federal anti-dilution statute, 15 U.S.C. § 1125(c). The statute generally provides protection to the owner of a "famous mark" from any use that "is likely to cause dilution by blurring or dilution by tarnishment of the famous mark . . . ." 15 U.S.C. § 1125(c)(1). Only a select number of marks, however, may qualify as "famous," and Congress intended the courts to be "discriminating and selective in categorizing a mark as famous." *I.P. Lund*, 163 F.3d at 46. As a result, the test of whether a mark has acquired fame is considered "more rigorous" and requires "a great deal more" than the analysis employed to determine if secondary meaning exists. *Id.* at 47. "[T]he mere acquisition of secondary meaning to achieve trademark status in a non-inherently distinctive designation is nowhere near sufficient to achieve the status of 'famous mark' under the anti-dilution statute." *Id.* (quoting 3 J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:91 (4th ed. 1996)).

Because Bern cannot show that its trade dress is distinctive or has acquired secondary meaning, it cannot establish that it is "famous" and entitled to protection under the anti-dilution provisions of § 1125(c)(1).  *See id.* (citing J. GILSON, TRADEMARK PROTECTION AND PRACTICE § 5.12[1][c][ii] (1998) ("A trademark can certainly be distinctive without being famous, but it cannot be famous without being distinctive.")).  The dilution claim must therefore fail.  Accordingly, defendants' motion for summary judgment as to that claim will be granted.

### C.     State-Law Claims

Count 3 alleges trade-dress infringement under Massachusetts law.  Federal and state trademark infringement law are essentially identical, and accordingly the state-law claims do not merit separate discussion.  *See Leejay, Inc. v. Bed Bath & Beyond, Inc.*, 942 F. Supp. 699, 701 n.2 (D. Mass. 1996).  Bern's state-law trade-dress infringement claim must therefore fail.

Count 4 alleges trade-dress dilution under Massachusetts law.  "The Massachusetts anti-dilution statute is less stringent than the federal statute." *Lyons v. Gillette*, 882 F. Supp. 2d 217, 228 (D. Mass. 2012).  However, pursuant to Mass. Gen. Laws ch. 110H § 13, plaintiff must still prove "(1) that its mark is distinctive and (2) that the defendant's use of a similar mark has created a likelihood of dilution." *Id.* (quoting *Santandar Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 231-32 (D. Mass. 2010)).  Because Bern cannot show that its trade dress is distinctive, its state-law dilution claim must fail.

Finally, Bern alleges that defendants have engaged in unfair methods of competition and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.  That claim is based on the same conduct as Bern's federal and state trade-dress infringement and dilution claims.  Because

those claims fail, and Bern has not established the existence of any other unfair or deceptive act or practice, Bern's Chapter 93A claim must also fail.

Accordingly, defendants' motion for summary judgment with respect to Bern's state-law claims will be granted.

## V.    Bern's Motion for Summary Judgment on Counterclaims

### A.    False-Advertising Counterclaims

Defendants have brought counterclaims against Bern for false advertising under the Lanham Act, 15 U.S.C. § 1125(a).  In substance, defendants contend that Bern's advertisements stating that the design was patented were false, and therefore are actionable under the Lanham Act.

The design was, in fact, patented.  At some point, however, Bern learned that the patent probably could not withstand a challenge for invalidity, because the patent application was filed more than one year after the helmets were first made available for sale.  Defendants have submitted a single statement of a Bern representative as their evidence of materiality.   They have submitted no evidence at all of actual injury, electing instead to rely on a legal presumption and to contend that the requirement of injury may be bypassed.

To prove false advertising, a claimant must establish the following:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002).

Defendants allege that Bern engaged in false advertising by expressly representing that its helmets were covered by the '865 patent and implying that its competitors' helmets were imitators. In support of their claims, defendants point to advertisements and marketing materials that refer to the '865 patent and internal e-mails and other documents from Bern that reveal its marketing strategies.

The Lanham Act "prohibits misrepresentations only in 'commercial advertising or promotion.'" *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003). "To constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." *Id.* There is no evidence that most of the documents that reveal Bern's marketing strategy were ever distributed to anyone outside of the company. Although some e-mails appear to be directed to individuals that are not affiliated with Bern, there is no evidence that these documents targeted anyone beyond those "individuals." As a result, those documents are not commercial advertisements. Defendants' claims therefore necessarily rest on the advertisements and marketing materials that were made available to the public.

For purposes of the present motion, Bern does not contest that there is a genuine dispute of material fact at least with respect to elements one and four of a false-advertising claim under the Lanham Act. Therefore, the Court will assume that there was a false or misleading description of fact in a commercial advertisement that was placed in interstate commerce. Bern contends, however, that defendants have not created a genuine dispute of material fact as to whether the alleged misrepresentations (1) deceived or were likely to deceive a substantial

segment of its audience, (2) were material, and (3) defendants have been or are likely to be injured as a result of it.

## 1. Deception

First, defendants must prove that "the alleged misrepresentation deceived a substantial portion of the consuming public." *Cashmere*, 284 F.3d at 313.[18] The usual method of proving consumer deception is through surveys that establish "consumers were misled by the alleged misrepresentations." *Id.* at 313-14 (citing *Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992)).[19] However, under certain circumstances, a claimant can rely on one of two possible presumptions and avoid having to prove actual consumer deception. *Id.* at 311. First, if "the advertisement is literally false, a violation may be established without evidence of consumer deception." *Id.* Second, if the advertiser "intentionally deceived the consuming public," a presumption of consumer deception arises. *Id.* at 311 n.8.

Here, defendants have not presented any survey evidence, and indeed no evidence at all of actual consumer deception. Therefore, if they are to prevail, they must rely on one of the two presumptions. They contend that both apply.

## a. Literal Falsity

Defendants first contend that Bern's advertisements were literally false because they stated that Bern owned the patent, even though it did not.

---

[18] To succeed on their claims for injunctive relief, defendants need only meet "the lesser burden of demonstrating a tendency to deceive." *Id.* at 313 n.12, 311 n.9.

[19] The case name appears as it does in the Second Circuit opinion. The asterisk is not a typographical error.

As an initial matter, the advertisements in question did not actually state that Bern owned the patent. Instead, they cite the patent number and use phrases such as "our patented hard visor shell shape," "our patented visor shape," "our patented integrated cap style visor and hard shell visor," "the original visor patent," or "the original visor shell patent." (Key Decl. Exs. 11, 12, 14, 15, Docket No. 390). In one advertisement, the actual patent is shown; however, the patent itself indicates that the inventor is Jonathan Baker. (Key Decl. Ex. 11).

It is true that there is some issue as to whether Bern actually owned the patent at the time of the alleged advertisements.[20] The '865 patent issued on July 8, 2008, with Jonathan Baker named as the inventor. On April 8, 2014, Jonathan Baker assigned the '865 patent to Bern. The assignment purported to be retroactive to January 19, 2007. Bern contends that Baker had previously assigned his rights in the '865 patent before the application was submitted, but that those documents cannot be located.[21] If there was not a prior assignment, Bern may not have technically owned the '865 patent.[22]

---

[20] Most of the defendants appear to have conceded that Bern owned the '865 patent "since at least the time the application was filed on January 19, 2007." (*See* Amer Sports Countercls. ¶ 8; BRG Countercls. ¶ 8; Vans Countercls. ¶ 10; Burton Countercls. ¶ 8; Smith Sports Countercls. ¶ 35). However, at least one defendant does not appear to have conceded that point. (*See* K-2 Countercls.).

[21] Bern also contends that because its Rule 30(b)(6) deposition designee testified that Bern believed it owned the patent since filing it, any ownership claims could not have been knowingly false. The issue, however, is not whether the ownership claims were knowingly false, but rather whether they were literally false.

[22] Bern contends that defendants may not rely on this argument to prove literal falsity because the Court previously ruled that whether Bern owned the '865 patent is not part of the case. (Pl.'s Reply Support Mot. Summ. J. 4 n.1 (citing Mem. & Order at 17 n.13)). In fact, the Court made no such ruling. In its Memorandum and Order dated June 12, 2014, the Court observed in a footnote:

> It appears that plaintiff did not own the '865 patent at the time it advertised its helmets, making any claim that they owned the patent that covered the helmets false. The counterclaims, however, do not allege that plaintiff made false statements in claiming to own the '865 patent.

(Mem. and Order at 17 n.13) (citations omitted). The Court's characterization of the *pleadings*—using the term "appears"—is hardly a definitive statement of the *evidence*.

There is no dispute, however, that Bern was *authorized* to manufacture products under the patent. Baker, the inventor, believed and understood that Bern owned the intellectual property rights to his design. There is no evidence that he has ever objected to Bern's use of his design. If a licensee or other authorized user of a patented product refers to the patent as "our" patent, that statement is not literally false. The word "our," in reference to property, can refer to ownership (for example, a homeowner referring to the property as "our house") or a legal right to use it (for example, a renter referring to an apartment as "our apartment").

In short, the statements were not literally false, and defendants therefore cannot rely on the presumption based on literal falsity.

### b.    Intentional Deception

Defendants further contend that Bern intentionally deceived its consumers because it knew by February 2011 that its patent was invalid, but nonetheless continued to use it in marketing materials. Specifically, defendants contend that the patent could not be enforced because of the one-year public disclosure bar, and that Bern knew that fact. The principal evidence on which defendants rely consists of two e-mails from a Bern sales representative and investor, John Phaneuf. (*See* Key Decl. Ex. 9, Docket No. 390; Walker Dep. 12). On February 3, 2011, Phaneuf wrote an e-mail to Adam Godwin stating, "I have had an uneasy feeling since Dennis explained to me that we did not file a patent in time for the Visor shape that we invented. Not sure how this happened but it is probably Bern's biggest mistake to date." (Key Decl. Ex. 9). On January 30, 2011, Phaneuf wrote to Bern founder Dennis Leedom to ask whether there is "any way to 'modify' our shipping records for the Baker to earn the patent?" (*Id.*).

It is unclear whether Phaneuf is an employee or an independent contractor. However, his statements indicate that Bern as an entity may have known as early as 2011 that its patent may have been unenforceable. In discussing those e-mails, Bern's 30(b)(6) deponent acknowledged that his understanding as of early 2011 was that the patent "would be very difficult to enforce. . . . [b]ecause it was filed late." (Bern 30(b)(6) Dep. by Godwin 407, Docket No. 408-1). Defendants contend that at the very least those e-mails show that as of February 2011 Bern knew that its patent was unenforceable, and that therefore its subsequent advertisements referring to the helmet as patented were intended to deceive its consumers.[23] The evidence is sufficient to create a genuine dispute of material fact, and therefore defendants may be able to rely on the presumption of consumer deception to satisfy the first element.

## 2. **Materiality**

Defendants must further prove that "the misrepresentation is material, in that it is likely to influence the purchasing decision." *Cashmere*, 284 F.3d at 311.

> Whether a misrepresentation is material has nothing to do with the nature of the relief sought or the defendants' intent. Rather, materiality focuses on whether the false or misleading statement is likely to make a difference to purchasers. Thus even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers.

284 F.3d at 312 n.10 (citation omitted).

In their introduction to their opposition to Bern's motion for summary judgment, defendants contended that "the materiality of the literally false advertisements is presumed."

---

[23] A patent is presumed to be valid. *See* 35 U.S.C. § 282. The validity of the design patent here was never formally challenged. Nonetheless, it seems clear that a claim of intentional deception could be made out based on the unenforceability of the patent, under the unusual factual circumstances presented here.

(Defs.' Mem. Opp. Pl.'s Mot. Summ. J. 2, Docket No. 403).  Other than that one mention, defendants failed to address the materiality requirement at any point in its memorandum.

At oral argument, defendants contended that they can rely on the presumption of materiality created when a "false or misleading statement relates to an 'inherent quality or characteristic' of the product.'" *Cashmere*, 284 F.3d at 311-12 (quoting *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)).  The question then becomes whether a misrepresentation that a product is patented relates to the "inherent quality or characteristic" of Bern's helmets.  Defendants cite to *Blank v. Pollack*, 916 F. Supp. 165 (N.D.N.Y. 1996).  In *Blank*, a defendant was sued under the Lanham Act for stating in a sales brochure that its folding window crank was patented.  *Id.*  The court denied summary judgment on a false advertising claim.  *Id.*  Relying on language in 15 U.S.C. § 1125(a)(1)(B), the court determined that after finding that "there is a question of fact as to the alleged falsity of the representations" at issue, the court must decide whether the statements misrepresented "'the nature, characteristics, qualities, or geographic origin' of the good in question."  *Id.* at 172.  The court concluded that "the misrepresentation that a product is patented relates to the nature and qualities of the product."  *Id.*  However, the court did not consider the question as a matter of materiality.  Rather, it appeared to have considered the question as a preliminary matter, concerning whether the Lanham Act could ever apply to false advertising claims involving patents.  The decision did not mention whether such a misrepresentation related to the "inherent" characteristic and qualities of the product.

For present purposes, the key word in the presumption of materiality is "inherent." "Inherent" has been defined as "structural or involved in the constitution or essential character

of something." Webster's Third New International Dictionary 1163 (2002).[24]  Courts have

applied the materiality presumption in a manner consistent with this definition.  For example, in

*Cashmere*, the First Circuit found that "overstating the cashmere content of cashmere-blend

blazers is material because the misrepresentation relates to an inherent characteristic of the

product sold."  284 F.3d at 312.  The court also found a misrepresentation as to the recycled

nature of cashmere also relates to an inherent characteristic of the garments.  *Id.*  In its analysis,

the court looked to an affidavit that explained how recycled fibers "frequently have substantial

surface damage to their scale structure" that affects their ability "to hold together as well or as

long as fibers which are being used in the fabric for the first time" as evidence that a false

statement as to the recycled nature of cashmere involves an inherent characteristic of the

product.  *Id.*

Other cases have applied the materiality definition in a similar manner.  For example, in

*National Basketball Ass'n v. Motorola, Inc.*, the Second Circuit examined whether statements in

a January 1996 press release that falsely represented that Motorola's SportsTrax score update

system updated game information with information "from each arena" that "originate[d] from

the press table" were material.  105 F.3d 841, 854-55 (2d Cir 1997).  The NBA contended that

this was a material misrepresentation because the reporters who updated the SportsTrax system

collected that information from television and radio broadcasts.  *Id.*  The Second Circuit

concluded that these statements as to origin were not material because they did not relate to an

---

[24] The Oxford English Dictionary defines inherent as "[e]xisting in something as a permanent attribute or quality; forming an element, esp. a characteristic or essential element of something; belonging to the intrinsic nature of that which is spoken of; indwelling, intrinsic, essential."  7 Oxford English Dictionary 969 (2d ed. 1989).

"inherent quality or characteristic" of the product and thus were not presumed to influence consumers. *Id.*[25]

In the absence of a presumption, defendants must proffer evidence of materiality to defeat summary judgment. Defendants submitted no survey or other evidence tending to prove that customers were likely to be influenced by the alleged misrepresentation. During oral argument, however, defendants pointed to testimony from Godwin, who was Bern's Rule 30(b)(6) deposition witness, as evidence that Bern knew that representations as to the patent would influence buying decisions. In his deposition, Godwin testified as follows:

> Q.    Would this message convey to retailers that they should do the right thing by not carrying products that infringe Bern's patent rights?
>
> A.    The intention was to help educate retailers about our patent and to try to get them to place their buy for visor lids with us and not our competitors.

(Bern 30(b)(6) Dep. by Godwin at 397-98, Docket No. 402-9).

Defendants' claim of materiality thus rests on that single exchange, which they did not even include in their briefing. That evidence, however, appears to be sufficient to create the inference that Bern at least hoped and indeed intended that its advertising of the patent would affect purchasing decisions. Therefore, there is a genuine issue of material fact as to whether in fact Bern's alleged misrepresentation was material.

### 3.    Injury

Finally, defendants must prove that they have been, or are likely to be, injured as a result of the false statement. The injury may be in the form of lost sales to actual or prospective

---

[25] Likewise, in *Holmes Group, Inc. v. RPS Products, Inc.*, 424 F. Supp. 2d 271 (D. Mass. 2006), this Court examined whether advertisements for a product as replacement filters for purifiers constituted a Lanham Act false-advertising violation. The Court determined that whether "replacement filters 'fit' Holmes purifiers clearly goes to the inherent qualities or characteristics of the product, and is thus material." *Id.* at 293.

buyers of the product or harm to the goodwill or reputation of the competitor. *Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24, 33 n.6 (1st Cir. 2000); *Cashmere*, 284 F.3d at 311.

When the defendant's representations in its advertisements are literally false, "only a slight likelihood of injury need be shown to warrant injunctive relief." *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods Corp.*, 799 F.2d 6, 15 (1st Cir. 1986). However, "when the allegation is based merely on the tendency of the defendant's representation to deceive," the "consumers' reaction is the starting point." *Id.* Similarly, as a general matter, "a plaintiff seeking [money] damages must prove actual harm, such as the diversion of sales to the defendant." *HipSaver Co., Inc. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 106 (D. Mass. 2007) (quoting *Aktiebolaget Electrolux v. Armatron Int'l Inc.*, 999 F.2d 1, 5 (1st Cir. 1993)).[26]

Defendants here have offered no evidence of any actual or likely injury resulting from the alleged misrepresentation. Among other things, they have not offered evidence of lost sales or consumer confusion, and have not attempted to prove harm to goodwill or reputation. Instead, they contend that they are entitled to rely on a presumption of harm as a matter of law. Alternatively, they contend that they can bypass the injury requirement in its entirety.

In *HipSaver*, 497 F. Supp. 2d at 106-09, (D. Mass. 2007), the court identified four methods by which a party can prove a right to monetary relief under the Lanham Act. According to the court,

---

[26] The counterclaims seek an injunction that would, among other things, bar the alleged misrepresentation. Bern has disclaimed the patent and stopped using it in advertising or in making its products and packaging. (Godwin Decl. ¶ 7, Docket No. 384; Godwin Decl. ¶¶ 2-3, Docket No. 398).

(1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant;

(2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation;

(3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and

(4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.

*Id.* at 106 (quoting *Aktiebolaget Electrolux*, 999 F.2d at 5 (1st Cir. 1993)).

Defendants here rely on the second and fourth methods of proving injury: (1) a presumption of injury that arises where "the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation," and (2) "where defendant's inequitable conduct warrants bypassing the usual rule of actual harm." *Id.*

The *HipSaver* court characterized the second method of proof as "a rebuttable presumption of causation and injury for willful literally false advertising in a two firm market where a defendant makes comparative statements targeting a direct competitor's products." *HipSaver*, 497 F. Supp. 2d at 109.[27] The presumption of causation and injury makes sense in a two-competitor market: by definition, if sales are increased by the false advertising of competitor A, they necessarily (or at least very probably) came at the expense of competitor B. In a market with multiple competitors, that underlying premise is substantially undermined, if not negated altogether.

---

[27] The quoted passage from *HipSaver*, which in turn quoted *Aktiebolaget*, referred to an action for an accounting rather than an action for money damages. It is unclear whether that distinction is meaningful in this context.

The helmet market is not a two-competitor market; indeed, there are more than seven parties to this lawsuit alone. Defendants nonetheless contend the presumption should still apply because "this case involves Bern, on the one hand, and *all* of the other major helmet manufacturers, on the other hand." (Defs.' Mem. Opp. Pl.'s Mot. Summ. J. 13, Docket No. 403). Defendants contend that this "allows the inference that any sales diverted by Bern's deception comes from the pool of defendants here." (*Id.*). However, even if the Court were to permit the presumption to apply to a market with more than two firms, defendants have presented no actual evidence to support their contention that every major helmet manufacturer is a defendant in this case. Plaintiff contends that Boeri, Marker, Leedom, Schwinn, and POC are also major helmet manufacturers. Plaintiff, however, does not have the burden of proving that there are other firms in the market. If the presumption is to apply, at a minimum defendants must establish that there are no other firms in the market. Because defendants have failed to do so, the presumption cannot apply.

In the alternative, defendants contend that "Bern's fraudulent conduct would justify 'bypassing the usual rule of actual harm' and assessing damages on an unjust enrichment or deterrence theory." (Defs.' Mem. Opp. Pl's Mot. Summ. J. 14, Docket No. 403). Under First Circuit case law, "damages have never been allowed under the deterrence or unjust enrichment theories absent some form of fraud." *Aktiebolaget Electrolux*, 999 F.2d at 6. It is unclear exactly when that method of proof in a false advertising case should apply. However, whatever it requires, it is clear that is should be reserved for extraordinary cases. This is not such a case. Defendants have not provided sufficient evidence to support a finding that Bern's conduct in this case rises to that level. *Cf. Aktiebolaget Electrolux*, 999 F.2d at 6.

Accordingly, defendants are not entitled to a presumption of causation and harm.

### 4. Overall Assessment of False-Advertising Claim

This Court previously characterized defendants' false-advertising claims as "thin, at best." (Mem. & Order Pl.'s Mot. Strike 16). The same can be said for the evidence supporting these claims. Defendants have presented no evidence of literal falsity, minimal evidence of deception, minimal evidence of materiality, and no evidence of causation and injury. Because there is no genuine issue of material fact as to defendants' false advertising claims, and because Bern is entitled to judgment as a matter of law, Bern's motion for summary judgment as to the counterclaims will be granted.

### B. State-Law Claims

Defendants concede that their state-law claims "rise or fall" with their federal Lanham Act claims. (*See* Defs.' Mem. Opp. Pl.'s Mot. Summ. J. 15 (citing *Holmes Group, Inc. v. RPS Prods., Inc.*, 424 F. Supp. 2d 271, 289 n.19 (D. Mass. 2006)). Because defendants' Lanham Act claims do not raise a genuine issue of material fact, their state law claims do not either. Accordingly, Bern's motion for summary judgment will be granted.

## VI. Conclusion

For the foregoing reasons:

1. The motion of defendant Vans for summary judgment (Docket No. 213) is GRANTED;

2. The motion of defendants Burton, BRG, Smith, K-2, and Amer for summary judgment (Docket No. 255) is GRANTED;

3. The motion of defendants Burton, BRG, Smith, K-2, and Amer to strike and exclude the expert opinions of David Rogers (Docket No. 266) is DENIED as moot;

4. The motions of defendants Burton, BRG, Smith, K-2, and Amer for summary judgment on the issue of likelihood of confusion (Docket Nos. 268, 274, 279, 283, 285) are DENIED as moot;

5. The motion of defendants to strike plaintiff Bern's declarations as untimely (Docket No. 295) is GRANTED;

6. The motion of plaintiff Bern to strike the expert opinions of Itamar Simonson (Docket No. 319) is DENIED;

7. The motion of plaintiff Bern for summary judgment on defendants' counterclaims (Docket No. 379) is GRANTED; and

8. This action is DISMISSED in its entirety.


**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 31, 2015